[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13024
_____

D.C. Docket No. 8:14-cr-00394-SCB-AEP-8


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLINGTON BARONA-BRAVO,
ROGER TEJADA-PIEDRAHITA,
VICTOR OTERO-POMARES,
JACINTO TORRES,
RAFAEL ANTONIO PATINO-VILLALOBOS,
JUAN CARRASQUILLA-LOMBADA,
EDUARDO EMILIO ORTIZ-CERVANTES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(April 14, 2017)

Before TJOFLAT, HULL, and O'MALLEY,[*] Circuit Judges.

HULL, Circuit Judge:

In September 2014, a dilapidated cargo vessel, the *Borocho*, was on its way from Colombia to Panama to pick up cargo. Unbeknownst to the *Borocho*'s captain, the crew had smuggled hundreds of kilograms of cocaine on board. Each of these crew members knew about certain amounts of drugs, but no one knew everything. There was one simple rule governing the conspiracy—you got paid based on how much you knew. In the midst of this voyage, the *Borocho* was boarded by the U.S. Coast Guard, who discovered the contraband and arrested all thirteen crew members. A federal grand jury indicted those thirteen crew members on conspiracy and drug charges. After trial, a jury convicted seven of them. This appeal followed. After thorough review, and with the benefit of oral argument, we affirm all of the defendant-appellants' convictions, but we vacate all of their sentences and remand for resentencing.

## I.  FACTUAL BACKGROUND

In April 2014, Yensi Manuel Medrano-Blanquiceth ("Medrano") was hired as a crewman aboard the *Borocho*. The *Borocho*, a 208-foot cargo freighter, traveled regularly between Puerto Nuevo, Colombia, and Colón, Panama. It would travel empty from Colombia to Panama, load legitimate merchandise (such as

---

[*]Honorable Kathleen M. O'Malley, United States Circuit Judge for the Federal Circuit, sitting by designation.

appliances and other household goods) on board at the free-trade zone in Colón, and then travel back to Colombia.

After Medrano was hired, a man he knew as Grand Old Parr approached Medrano and asked if he would smuggle cocaine onto the ship. Medrano agreed. Medrano was then approached by Andres Ramon Fontalvo-Martinez ("Fontalvo"), who already worked on the *Borocho*, about smuggling additional cocaine onto the vessel. In addition to the cocaine that Medrano personally brought onboard, there was an additional 400 kilograms of cocaine already hidden on the ship. The *Borocho* sailed in June 2014 and arrived without incident in Panama. In addition to Medrano and Fontalvo, defendants Roger Tejada-Piedrahita ("Tejada"), Jacinto Torres ("Torres"), and Eduardo Emilio Ortiz-Cervantes ("Ortiz") were also crewmen on that voyage, and each of them knew about, and helped participate in, the smuggling scheme.

The crew stayed in Panama for 40 to 50 days. While in Panama, Fontalvo and Medrano met with a drug supplier, "Mufasa," and Mufasa's apprentice, "Benedito," to discuss another drug smuggling operation aboard the *Borocho*.

The *Borocho* eventually returned to Colombia. When the ship was moored off the coast of Colombia at the end of this return trip, a 100-kg load of cocaine was transported to the *Borocho* by a smaller boat and hidden in the *Borocho*'s forepeak. Once the *Borocho* was docked in Puerto Nuevo, Colombia, the crew

3

unloaded the legitimate merchandise, leaving the 100 kilograms of cocaine hidden onboard.

When the *Borocho* returned to Colombia, some of the prior crewmen were fired or left voluntarily, some remained, and some new crewmen were hired. Among the new crewmen hired were defendants Juan Carrasquilla-Lombada ("Carrasquilla"), Victor Otero-Pomares ("Otero-Pomares"), Rafael Antonio Patino-Villalobos ("Patino-Villalobos"), and Willington Barona-Bravo ("Barona-Bravo").[1]

Thereafter, Roger Barrios, a former *Borocho* crewman who was in charge of delivering drugs to the *Borocho*, told Fontalvo to expect a 200-kg delivery of cocaine.[2]  Fontalvo, in turn, notified Medrano and defendants Torres and Tejada of the impending 200-kg delivery.  The 200 kilograms arrived in approximately eight bales.  The cocaine was delivered by a small boat in the middle of the night while the *Borocho* was moored off the dock in Puerto Nuevo.  Medrano and defendant Otero-Pomares hauled the bales onboard the *Borocho* as Fontalvo and defendants Torres and Carrasquilla watched.  Defendant Tejada also knew about this delivery and was tasked with distracting the captain.  After the cocaine was on board, the crew hid it in a ballast tank underneath the cargo hold.  The crew also moved the

---

[1]In this opinion, we have adopted each defendant's surname as used in their briefs.

[2]A crewman named Roberto Acosta (aka "Calvo") was formerly in charge of coordinating deliveries of cocaine to the *Borocho*, but Fontalvo was tapped as the man to handle future deliveries of cocaine after Calvo was fired.

100 kilograms of cocaine previously hidden in the forepeak down to the same ballast tank.[3]

For participating in and/or having knowledge of each load of cocaine, the crew members were paid advances either directly in cash or through money deposited into third-party accounts of their choosing. Medrano acknowledged that crew members were only paid for the narcotics they knew about and "the less that other people know, the less money you have to share with them."

For example, Fontalvo was given 90 million Colombian pesos to pay the crewmen for the 200-kg load. To facilitate payments, Fontalvo compiled the third-party account information in a ledger entitled "night orders" and sent the information to Barrios via the "What's Up" app on his cell phone.

After this delivery, Medrano hid another thirteen kilograms of cocaine, contained in a blue duffel bag, in the ballast tank. This was a side deal that Medrano and Fontalvo had struck with another supplier, and only these two knew that the cocaine was in the ballast tank.

Then, before the vessel was underway, defendants Barona-Bravo, Patino-Villalobos, and two other men delivered three barrels allegedly containing 86 total

---

[3]The ballast tanks on the *Borocho* were large spaces, built with walls containing large holes, or "baffles," spaced every six to teen feet. There were multiple ballast tanks on the *Borocho*, but the evidence established that the crew hid cocaine in only one of them.

kilograms of cocaine to the *Borocho* via a small speedboat.[4] Medrano and defendants Otero-Pomares, Ortiz, Torres, and Barona-Bravo hauled the barrels onboard and hid them in the ballast tank. Carrasquilla observed.

Once the three barrels were hidden onboard, Barona-Bravo told the crew that another 200 kilograms of cocaine were to be delivered that night. The second 200-kg load was then delivered to the *Borocho* via speedboat. As before, Medrano and defendant Otero-Pomares threw down ropes and hauled the drugs onboard. Defendants Torres, Barona-Bravo, and Ortiz were also present when the cocaine was delivered. Carrasquilla again observed. Medrano and Otero-Pomares hid the second 200 kilograms in the ballast tank.

On September 5, 2014, the *Borocho* left Puerto Nuevo, Colombia with more than 600 kilograms of cocaine hidden onboard. After the *Borocho* set sail, defendant Barona-Bravo, through defendant Tejada, paid Medrano for the second 200-kg load. Defendant Tejada gave Medrano $2,000 in U.S. currency (in the form of 20 $100 bills) and 350,000 Colombian pesos (approximately $170). All of the crewmen except for defendant Otero-Pomares received payment for that load while on board; Otero-Pomares's payment was sent directly to his mother.

---

[4]Medrano testified that defendant Barona-Bravo told him there were 86 kilograms in the barrels. The Coast Guard officer who helped remove the barrels from the ballast tank testified that small packages of contraband were inside the barrels, but he did not know how much cocaine was recovered from the barrels.

On September 7, 2014, the U.S. Coast Guard cutter *Bear*, on patrol in the Southern Caribbean, spied the *Borocho* in international waters 70 miles off the coast of Panama.   The *Borocho* was riding high in the water (indicating that it was not carrying any cargo) and was not transmitting an electronic signal that is "common for all commercial vessels," prompting the Coast Guard to investigate.

Coast Guard boarding officer Stephen J. Fleming and his team conducted a right-of-visit boarding on the morning of September 7.  According to Officer Fleming, the *Borocho* was in the worst condition he'd ever seen in his nearly fifteen years of Coast Guard service.  The ship's handrails were unbolted and rusted, the entire deck was covered in rust, the cargo hold was in "[v]ery poor" condition, the single life raft on board was "non-operational," there was a hose illegally pumping oil and water from the bilge overboard, and the engine room had two open fuel tanks (a fire hazard) and a floor covered in seawater.

The Coast Guard boarding team gathered all of the *Borocho*'s crew members, with the exception of the captain, who remained on the bridge.  Officer Fleming spoke with the captain and requested the ship's documentation.  The captain provided Officer Fleming with a crew list, naming thirteen crew members and zero passengers, the crew's passports, and a "zarpe," a document that shows, among other items, the ship's name, captain's name, and ports of call.

7

The captain told the Coast Guard members that the *Borocho* was registered in the West African country of Sao Tome and Principe. Coast Guard personnel also located a vessel registration document that was purportedly issued by the country of Sao Tome and Principe. The Coast Guard contacted the U.S. State Department, who in turn reached out to the government of Sao Tome and Principe. That country's government refuted the vessel's claim of registry. Consequently, the Coast Guard determined that the *Borocho* was stateless and proceeded to search the vessel.

At approximately 5:00 p.m. on September 7, Officer Fleming handed off command to Coast Guard boarding officer William Kelly. By that time, the Coast Guard had determined that the *Borocho* was stateless and had received authorization to search the *Borocho.* During a search of the *Borocho*, Officer Kelly discovered 55 kilograms of cocaine hidden in a lube oil tank located on the upper deck of the engine room. Officer Kelly's team then detained the crew.

At approximately 7:00 p.m. on September 8, Officer Fleming and his team went back to the *Borocho* to relieve Officer Kelly. Officer Fleming continued searching the vessel and discovered three blue barrels and twenty-three burlap sacks filled with cocaine hidden in one of the ship's ballast tanks, which normally contain seawater in order to stabilize the ship. The ballast tank was located

8

underneath the cargo hold, which was itself covered in trash and debris.[5]  In total, the Coast Guard boarding party found 640.9 kilograms of cocaine on the *Borocho*.

On September 9, 2014, the *Borocho*'s crewmen were transferred to the *Bear*. Coast Guard officers searched each crew member and inventoried the property seized from them.  Nearly all of the crew members had thousands of dollars' worth of U.S. and Colombian currency in his possession.

The *Borocho* was towed to port in Miami, Florida.  Before the *Borocho* arrived in Miami, agents from the Drug Enforcement Administration ("DEA") boarded and searched the vessel and recovered cell phones and SIM cards belonging to crew members.  The thirteen crew members were transported to Tampa**,** Florida, where DEA agents and immigration agents processed them into the United States.  The crew members were then transferred to a nearby jail to await trial.

## II.  PROCEDURAL HISTORY

A federal grand jury indicted all thirteen crewmen on two charges: (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a) and (b), and 21 U.S.C.

---

[5]Coast Guard personnel searched the first twenty feet from the tank cover toward the back of the tank, but deemed it unsafe to search any farther.  From that search, the Coast Guard recovered the three blue barrels and twenty-three bales of cocaine.

§ 960(b)(1)(B)(ii) ("Count One"); and (2) possession with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(1)(B)(ii) ("Count Two").  Before trial, Medrano and Fontalvo pled guilty and agreed to testify for the government.

Trial commenced on February 23, 2015, and lasted for nine days.  The government presented testimony from, and documentary evidence gathered by, Coast Guard officers, DEA agents, and other federal government agents.  Medrano and Fontalvo also provided lengthy testimony against their former fellow crew members.

At the close of the government's case-in-chief, all eleven remaining codefendants moved for a judgment of acquittal.  The district court granted a directed verdict of acquittal to the captain, as the evidence had demonstrated that he was ignorant of the smuggling operation onboard the *Borocho*, but denied the motions as to all other defendants.

At the conclusion of trial, the jury rendered its verdicts.  It acquitted three of the indicted codefendants—Javier Enrique Cardenas-Socarras, Heber Augusto Sanchez-Cortes, and Manuel Esteban Melendez—as to both counts.  It found defendants Carrasquilla and Tejada guilty on Count One (the conspiracy charge) and not guilty as to Count Two (the possession charge).  The jury found defendants

Barona-Bravo, Ortiz, Otero-Pomares, Torres, and Patino-Villalobos guilty on both Counts One and Two.

The seven convicted codefendants were sentenced together in one hearing. The district court imposed total sentences of 235 months' imprisonment as to all seven codefendants.

The seven codefendants now appeal, alleging various errors in their trial and sentencing. We will address the issues raised by the defendant-appellants in the following order: (1) the Confrontation Clause issue raised by six of the defendant-appellants; (2) the alleged evidentiary errors raised by defendant Tejada; (3) the sufficiency-of-the-evidence arguments raised by defendants Carrasquilla and Patino-Villalobos; (4) the district court's denial of defendant Carrasquilla's motion for a new trial; and (5) the sentencing issues.

### III.  THE CONFRONTATION CLAUSE AND THE MDLEA

In January 2015, approximately six weeks before trial, the government filed a State Department certification regarding the *Borocho*. The document consisted primarily of a "Certification for the Maritime Drug Law Enforcement Act Case Involving Motor Vessel Borocho (Without Nationality) Federal Drug Identification Number (FDIN) – 2014008289" signed by Coast Guard Commander Gregory Tozzi.

11

In that Certification, Commander Tozzi declared that, on September 7, 2014, the Coast Guard detected the *Borocho* "approximately 165 nautical miles northeast of Colon, Panama," in international waters.  During the Coast Guard's September 7 right-of-visit boarding of the *Borocho*, the "master" told Coast Guard members that the vessel was registered in Sao Tome and Principe, and Coast Guard members found a registration document on board supporting that claim.  The Coast Guard asked that country to confirm or deny the vessel's registry, and the Sao Tome government "refut[ed]" the *Borocho*'s claim of registry.  On September 9, 2014, members of the Coast Guard boarded the *Borocho* and discovered the cocaine.

"Accordingly, the Government of the United States determined the vessel was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(A), rending the vessel subject to the jurisdiction of the United States Pursuant to 46 U.S.C. § 70502(c)(1)(A)."  Commander Tozzi's declaration was accompanied by a document signed by a State Department Assistant Authentication Officer on behalf of the Secretary of State averring that Tozzi was the Coast Guard liaison to the State Department and giving full faith and credit to Tozzi's statements.

At the conclusion of the government's case-in-chief, the district court found that the trial evidence supported the declaration and concluded that the *Borocho* was subject to the jurisdiction of the United States.  Defendant Carrasquilla's

counsel objected "for the record" to the declaration "on confrontation grounds."

The district court's pretrial order provided that any objection or motion made by

any defense counsel at trial would be deemed to be adopted and joined in by every

other defendant.  Thus, this objection was preserved as to all defendants.

We review preserved Confrontation Clause claims de novo.  United States v.

Wilson, 788 F.3d 1298, 1316 (11th Cir. 2015).  The defendants here were

convicted under the Maritime Drug Law Enforcement Act ("MDLEA"), which

prohibits the knowing or intentional possession with intent to manufacture or

distribute of a controlled substance on board "a vessel subject to the jurisdiction of

the United States."  46 U.S.C. § 70503(a)(1), (e)(1).  Vessels subject to the

jurisdiction of the United States include "a vessel without nationality," which is

defined to include "a vessel aboard which the master or individual in charge makes

a claim of registry and for which the claimed nation of registry does not

affirmatively and unequivocally assert that the vessel is of its nationality."  Id.

§ 70502(c)(1)(A), (d)(1)(C).  The Department of State's certification is conclusive

proof of the foreign nation's response under the MDLEA.  Id. § 70502(d)(2) ("The

response of a foreign nation to a claim of registry under paragraph (1)(A) or (C)

. . . is proved conclusively by certification of the Secretary of State or the

Secretary's designee.").  Further, the MDLEA provides that "[j]urisdiction of the

United States with respect to a vessel subject to this chapter is not an element of an

13

offense.  Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."  Id. § 70504(a).

This Court has squarely held that the Confrontation Clause does not bar the admission of a certification from the Secretary of State to establish jurisdiction under the MDLEA because the "stateless nature" of the vessel is not an element of the offense that must be proved at trial.  United States v. Campbell, 743 F.3d 802, 807 (11th Cir. 2014).  This Court pointed out that this pretrial determination of jurisdiction did not implicate any guilt or innocence issue but instead bears only on "the diplomatic relations between the United States and foreign governments."  Id. at 807-08.  Thus, this Court held that the admission of the certification did not violate the defendant's Confrontation Clause rights.  Id. at 807.

Although the defendants recognize Campbell,[6] they argue, without support, that the MDLEA jurisdictional requirement is the "functional equivalent" of an element of the offense.  They argue that, while this element does not go to the jury, "jurisdiction remains a material element to be proven by the Government as a prerequisite to a conviction under the MDLEA."  Campbell binds us in this case, so the defendants' argument necessarily fails.  See United States v. Cruickshank, 837 F.3d 1182, 1188, 1192 (11th Cir. 2016), cert. denied, __ S. Ct. __, 2017 WL 1199489 (2017) (citing Campbell and rejecting as "foreclosed by our prior

---

[6]All of the defendants, except for Patino-Villalobos, raise this argument.

14

precedent" the defendant's argument that a Department of State certification for MDLEA purposes violates the Confrontation Clause); see also United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc.").

Moreover, the timing of the district court's jurisdictional determination (during trial rather than before trial) has no bearing on whether jurisdiction is an "element." The MDLEA clearly states that "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense." 46 U.S.C. § 70504(a); see also United States v. Tinoco, 304 F.3d 1088, 1108 (11th Cir. 2002) ("[T]he MDLEA jurisdictional requirement does not raise factual questions that traditionally would have been treated as elements of an offense under the common law."). And to the extent the defendants argue that the certification was vague, insufficient to prove jurisdiction, or inconsistent with the trial testimony, the certification is, by law, conclusive proof of the foreign nation's response under the MDLEA. 46 U.S.C. § 70502(d)(2).

## IV.  EVIDENTIARY ISSUES AS TO TEJADA

On appeal, defendant Tejada challenges the admission of two pieces of evidence.[7]  First, Tejada argues that the district court erred in admitting into evidence a statement he allegedly made to a DEA agent, in violation of Federal Rule of Criminal Procedure 16 and the district court's discovery order. Specifically, during Tejada's processing into the United States, Tejada disclosed his relationship with Candelaria Isabel Manjarrez-Gutierrez ("Manjarrez") to a DEA agent, and this information was recorded on Form DEA-202, a "Personal History Report."  Alternatively, Tejada argues that the district court should have excluded this same evidence as hearsay.  Second, Tejada argues that the district court erred in admitting "alleged summaries of the call logs, contact lists, and text messages" found on his cell phone and SIM cards.  We address each issue in turn.

### A.    Evidence Concerning Tejada's Relationship with Manjarrez

On September 2, 2014, Fontalvo texted Manjarrez's name and bank account information to Roger Barrios after one of the crewmen (Fontalvo could not remember which one) had provided it in order to get paid for one of the loads. Fontalvo testified that the money was never sent.

Later, via DEA Agent Carlos Galloza, the government attempted to establish that Manjarrez was Tejada's wife.  Tejada objected, asking how Agent Galloza

---

[7]To the extent the other defendant-appellants seek to adopt the issues addressed in Parts IV, V, and VI of this opinion, we conclude that any such challenge is meritless.

knew that Manjarrez was his wife.  At a sidebar, the prosecutor explained that he was relying, in part,[8] on Form DEA-202, which contained information given by Tejada to an unidentified DEA agent as Tejada was being processed into the United States.  The prosecutor explained that "[a]ll defendants when they are processed, . . . they are interviewed for information that would complete a DEA-202 form.  Mr. Tejada, during that processing, gave – identified relatives to include his wife."  The prosecutor represented that the DEA-202 was a "standard form" that was "strictly processing" and merely listed information such as address, date of birth, nationality, "biographical information" and "next of kin."

Tejada's attorney objected that the statements reflected in the DEA-202 were a product of custodial interrogation and that the government had not disclosed its intention to use any statements from the DEA-202 at trial, as required by Federal Rule of Criminal Procedure 16 and the district court's standing discovery order, and this failure deprived Tejada of the opportunity to move to suppress the statement.  The government argued that the statement on the DEA-202 form was not the product of an interrogation but, rather, was the product of a

---

[8]The government also sought to tie Tejada to Manjarrez through Western Union records showing Tejada wiring money to Manjarrez.  The Western Union records were not admitted into evidence.

17

"standard booking process" in which the DEA collected the biographical information of arrested persons.[9]

The prosecutor also admitted that Agent Galloza was not the agent who took the statement contained in the DEA-202, and Tejada's attorney objected that Agent Galloza's testimony concerning Manjarrez's identity should be excluded as hearsay. The district court overruled the objections. Agent Galloza then testified that Manjarrez "is the wife of Mr. Tejada."

We review the district court's overruling of defendant Tejada's objections, based on Rule 16 and hearsay grounds, for an abuse of discretion. See United States v. Brown, 441 F.3d 1330, 1359 (11th Cir. 2006) (addressing hearsay rulings); United States v. Perez, 960 F.2d 1569, 1572 (11th Cir. 1992) (addressing Rule 16 rulings).

Rule 16 requires the government to disclose and make available to a defendant "the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a

---

[9]It appears that there were two versions of the same DEA-202 form: one typed and one handwritten. Both versions listed Manjarrez as a relative. But the typed version listed Manjarrez as Tejada's daughter, and the handwritten version listed her as his wife.

At trial, the government attempted to rely on the information in the handwritten form, which listed Manjarrez as Tejada's wife (although the government also stated that the distinction was "irrelevant"). The record does not reveal why there are two different forms, whether Tejada or a DEA agent filled out the handwritten form, or why the information was different in the two forms. Neither DEA-202 form was admitted into evidence. The only evidence admitted was Agent Galloza's testimony that Manjarrez was Tejada's wife.

18

government agent." Fed. R. Crim. P. 16(a)(1)(B)(ii). By its terms, Rule 16 applies only to statements made during an "interrogation." See id. As defendant Tejada correctly notes, Rule 16 does not define the term "interrogation," but at least one court of appeal has "imported" the definition from the Supreme Court's decision in Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682 (1980). See Smith v. United States, 285 F. App'x 209, 214 (6th Cir. 2008) (unpublished). In Innis, a case involving a defendant's Miranda rights, the Supreme Court wrote that "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to an interrogation." 446 U.S. at 301, 100 S. Ct. at 1690. But, the Supreme Court cautioned, "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Id. at 302, 100 S. Ct. at 1690.

Defendant Tejada cites no support for his claim that a DEA-202 form that asks for names of relatives or next of kin is "interrogation" under Rule 16. We find no case supporting that claim and conclude there was no Rule 16 violation.

Alternatively, even if the DEA-202 is somehow an "interrogation" within the meaning of Rule 16, "[v]iolations of Rule 16 will result in a reversal of conviction only if such a violation prejudices a defendant's substantial rights." United States v. Chastain, 198 F.3d 1338, 1348 (11th Cir. 1999) (quoting United

19

States v. Perez-Garcia, 904 F.2d 1534, 1546 (11th Cir. 1990)); see also United

States v. Camargo–Vergara, 57 F.3d 993, 998 (11th Cir. 1995) (providing that a

discovery violation under Rule 16 or a standing discovery order "is reversible error

only when it violates a defendant's substantial rights").  A defendant's substantial

rights are affected when the defendant is unduly surprised and lacks an adequate

opportunity to prepare a defense, or if the mistake substantially influences the jury.

Camargo–Vergara, 57 F.3d at 998-99.  To be entitled to a new trial, "actual

prejudice must be shown."  Chastain, 198 F.3d at 1348.

Defendant Tejada has not demonstrated actual prejudice from the alleged

violation of Rule 16 and the district court's standing discovery order.  The

evidence presented at trial, through Medrano's and Fontalvo's testimony,

demonstrated that Tejada's role in the conspiracy was to distract the captain while

large shipments of narcotics were being loaded and unloaded from the *Borocho*.

What's more, Medrano and Fontalvo testified that Tejada knew of and was tasked

with distracting the captain specifically during the loading of the first 200-kg load

of cocaine onto the *Borocho*, the same load for which Fontalvo attempted to send

Manjarrez an advance payment.

The evidence demonstrated that defendant Tejada was also in charge of

disbursing payments (of $2,000 in U.S. currency and 350,000 Colombian pesos) to

the crew for the final 200-kg load.  In addition, Medrano testified that Tejada had

20

knowledge of the 100-kg load that was loaded onto the *Borocho* when it was moored off the Colombian coast.  At his arrest, Tejada had $1,000 in U.S. dollars and $2,950,000 Colombian pesos (worth approximately $1,500) in his possession.

Thus, contrary to defendant Tejada's assertion that "the most prejudicial" evidence offered at trial was his connection to Manjarrez, the evidence regarding his relationship with Manjarrez was only a minor part, and far from the most damaging part, of the evidence against Tejada.  Even if the government had disclosed Tejada's statement on the DEA-202 earlier, and even if Tejada had successfully suppressed this evidence, the jury still would have been presented with all of the evidence detailed above regarding his involvement with the drug-smuggling conspiracy onboard the *Borocho*.  Accordingly, Tejada has failed to demonstrate how his substantial rights were affected.  See Chastain, 198 F.3d at 1348.

Similarly, even if the district court should have excluded Agent Galloza's testimony on hearsay grounds, Tejada is not entitled to relief because the error, if any, was harmless for the reasons explained above.  See United States v. Khanani, 502 F.3d 1281, 1292 (11th Cir. 2007) (applying harmless-error review to admission of evidence challenged as hearsay and stating that this Court will not reverse a conviction if "sufficient evidence uninfected by any error supports the

21

verdict, and the error did not have a substantial influence on the outcome of the case").

We are also unpersuaded by Tejada's argument that, but for this alleged discovery violation, he "would have sought to obtain expert testimony" regarding how frequently maritime cocaine traffickers pay smuggling participants through payments to the participants' family members. Tejada has not suggested who this "expert" might be or what sort of testimony they would have given. Further, there was ample evidence at trial that such a payment system was in place onboard the *Borocho*, and none of the defendants' lawyers purported to call such an expert. Nor has Tejada explained how such expert's testimony would have led to an acquittal, given the other evidence against him.

## B.    Evidence Extracted from Tejada's Cell Phones and SIM Cards

The Coast Guard found two cell phones in defendant Tejada's stateroom aboard the *Borocho*. Tejada consented to a search of the cell phones and the SIM cards within the phones. At trial, Coast Guard Lieutenant Matt Peterson testified that he extracted data from the cell phones and SIM cards using a program called Cellebrite. Tejada objected that Peterson did not design the Cellebrite program and, consequently, there was "no foundation . . . that the information contained on the phone [was] a fair and accurate representation of what was actually in the phone." The district court declined to admit Government Exhibit 23A (a

22

photograph of the two cell phones) and Government Exhibits 23C, 23D, and 23E

(disks containing the extraction reports of the data from the SIM cards and

phones).

The prosecutor, however, had printed out copies of the extraction reports.

The prosecutor also stated that Agent Galloza had reviewed the extraction reports.

Tejada objected to the printouts as lacking authentication.  The district court

overruled this objection and admitted the printouts as Government Exhibits 23C-1,

23D-1, and 23E-1.

DEA Agent Galloza later testified that he had reviewed the extraction

reports prepared by the Coast Guard and had prepared his own summary of

relevant phone numbers found on the reports.  Relying on his summary, Agent

Galloza testified that defendant Tejada's cell phone contact lists included phone

numbers for three former *Borocho* crewmen involved in smuggling drugs.[10]

On appeal, defendant Tejada argues that the district court erred in admitting

Government Exhibits 23C-1, 23D-1, and 23E-1 because "there was no competent

evidence in the record to support Agent Galloza's testimony that those exhibits

were fair and accurate summaries of the information contained on any cell phone

or SIM card that belonged" to him.

---

[10]Specifically, defendant Tejada had the phone numbers of Julio Flores and Roberto Acosta (aka "Calvo"), who both organized drug trafficking activity for previous voyages on the *Borocho*, and Clemente Salas, who Agent Galloza described as a person who had previously smuggled drugs on the *Borocho*.  Tejada also had the phone number of his codefendant Ortiz.

23

We need not decide if the district court erred in admitting these printouts because the error, if any, did not substantially prejudice Tejada for the reasons previously explained. See Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1232 (11th Cir. 2004) (explaining that this Court reviews the district court's evidentiary rulings for abuse of discretion and will reverse only if an erroneous ruling resulted in substantial prejudice). Even if the district court had excluded the evidence demonstrating that Tejada had the phone numbers of Flores, Calvo, and Salas, the jury would still have heard testimony from Medrano and Fontalvo regarding Tejada's role in the smuggling conspiracy.

Moreover, Agent Galloza testified that two of Tejada's codefendants—Cardenas-Socarras and Sanchez-Cortes—also had the phone numbers of Flores and Calvo in their phones' contact lists. And yet the jury acquitted Cardenas-Socarras and Sanchez-Cortes of all charges. Thus, Tejada concedes in his brief on appeal that the admission of this evidence was "[a]rguably" harmless because the jury's acquittal of Cardenas-Socarras and Sanchez-Cortes indicates that it gave little or no weight to the defendants' cell phone contacts.

## V.  SUFFICIENCY OF THE EVIDENCE AS TO CARRASQUILLA AND PATINO-VILLALOBOS

Defendants Carrasquilla and Patino-Villalobos challenge the sufficiency of the evidence supporting their convictions. By way of review, Patino-Villalobos was convicted of both counts while Carrasquilla was convicted of only the

24

conspiracy charge.  Both defendants timely moved for judgments of acquittal, which the district court denied.

We review de novo the sufficiency of the evidence against them, "viewing the evidence in the light most favorable to the government and resolv[ing] all reasonable inferences and credibility evaluations in favor of the jury's verdict." Tinoco, 304 F.3d at 1122.  We will not disturb a jury's verdict "unless no trier of fact could have found guilt beyond a reasonable doubt."  Id. (quoting United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997)).

To prove the existence of a conspiracy, the government must establish "that an agreement existed between two or more persons and that the defendant knowingly and voluntarily participated in it."  Id. (quoting United States v. Garate-Vergara, 942 F.2d 1543, 1547 (11th Cir. 1991), modified, 991 F.2d 662 (11th Cir. 1993)).  The government can make its showing through circumstantial evidence. Id.

Possession of a controlled substance with intent to distribute may also be proven through circumstantial evidence.  Id. at 1123.  "Possession may be either actual or constructive; if the accused exercised some measure of dominion or control over the contraband, either exclusively or in association with others, he constructively possessed it."  Id. (quoting United States v. Battle, 892 F.2d 992, 999 (11th Cir. 1990) (per curiam)).

In addition, in cases like the one now before us, this Court has held that the following factors should be considered in determining whether a jury could reasonably conclude that a defendant found on a drug-laden vessel was guilty of drug conspiracy and possession charges:

> (1) probable length of the voyage, (2) the size of the contraband shipment, (3) the necessarily close relationship between captain and crew, (4) the obviousness of the contraband, and (5) other factors, such as suspicious behavior or diversionary maneuvers before apprehension, attempts to flee, inculpatory statements made after apprehension, witnessed participation of the crew, and the absence of supplies or equipment necessary to the vessel's intended use.

Garate-Vergara, 942 F.2d at 1547. The size of the vessel is also relevant in determining the relative quantity of the contraband and its obviousness to the crew. Id. at 1547-48. "[O]nce a large quantity of contraband is shown to have been present on a vessel, the government's remaining burden of showing that the crew knowingly participated in the drug smuggling operation is 'relatively light.'" Tinoco, 304 F.3d at 1123 (quoting United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir. 1985)).

## A.    Carrasquilla

The evidence produced at trial demonstrated that defendant Carrasquilla was a 74-year-old mechanic on the *Borocho*. While purportedly the ship's engineer, when Coast Guard officers asked Carrasquilla to turn the lights on in the cargo

hold or work the pumps to transfer liquid in the ballast tanks, Carrasquilla claimed not to know how to perform these functions.

Carrasquilla was hired for the unsuccessful September voyage, arriving before some of the prior crew had left the vessel. He arrived on the morning of September 4, 2014.

Fontalvo testified that Carrasquilla came aboard unaware of the drugs that were already on the boat. Fontalvo further testified: "But the day after the drugs were loaded onto the boat, early in the day, Mr. Carrasquilla told me, 'Diomeres, yesterday I saw some strange movement onboard the boat that I didn't like. What's happening here?'" Fontalvo replied, "last night we did load up a little something, but don't worry about it. You'll get your chocolate too." After making this statement, Fontalvo simply walked away, not allowing Carrasquilla a chance to respond. The next day, Fontalvo approached Carrasquilla and asked him for an account number to send the money to. Fontalvo had to explain why he needed the account number. Fontalvo testified that Carrasquilla "didn't like it, but he says, 'well, there's nothing I can do about it now. It's already up on the boat. There's nothing I can do about it now.' And he accepted."

Fontalvo kept a document called "night orders" where he wrote down who was paid what for the first 200-kg load. Next to "Juancho" (aka Carrasquilla), he had written down the name Miguel Ballestas and an account number. Fontalvo

27

said he understood Ballestas to be "a friend or family member" of Carrasquilla's. Further, on September 4, 2014, Fontalvo sent another drug smuggler, Naranja,[11] a text message with the name of Carrasquilla's wife, Edythe Ballestas Carrasquilla, and an account number.

Similarly, Medrano testified that Carrasquilla was not there when the 100 kilograms arrived, but he was present for the arrival of the first 200-kg load. While Otero-Pomares and Medrano did the heavy lifting, Carrasquilla did "nothing" but was going to get paid the same because he was in the know as to that shipment. Medrano testified that "on Mr. Fontalvo's [the first 200 kilograms], he told me that we had to send something to Carrasquilla's family because he had realized." Fontalvo testified that it was his decision to cut Carrasquilla in because he was the engineer "even if he doesn't do anything with the kilos."

Medrano testified that defendant Carrasquilla was also present for the 86-kg load that came aboard in the three blue barrels and the second 200-kg load. In all this, he "was paid to watch." Medrano also testified that the entire crew, which would include Carrasquilla, met without the captain and agreed to take the second 200-kg load and share the profits. Further, when the loads were made, the vessel was moored off the Colombian coast and was not yet underway on the seas.

---

[11]Naranja was a former crew member on the *Borocho* who served as a watchdog for Julio Flores and had participated in previous drug-smuggling runs.

When he was arrested, defendant Carrasquilla had $2,140 of U.S. currency (in $100 and $20 bills) on his person.  And when DEA Agent Galloza searched Carrasquilla's cell phone, he discovered that Carrasquilla had saved the phone numbers of multiple drug smugglers involved in this or earlier voyages:  Flores, Naranja, Salas, and Calvo, among others.  On cross-examination, Carrasquilla's attorney established that only three calls had been made from this phone, none to people involved in the drug trade.

On appeal, Carrasquilla primarily argues that, even if there was a conspiracy onboard the *Borocho*, he did not knowingly or willfully join it.  Rather, by the time he got on board and learned of it, it was too late and too dangerous to do anything about it.  To prove knowing and voluntary participation in a conspiracy, the government must show that the defendant had a specific intent to join the conspiracy.  Calderon, 127 F.3d at 1326.  However, once the government establishes the existence of an underlying conspiracy, it need only come forward with "slight evidence to connect a particular defendant to the conspiracy."  Id. (quoting United States v. Jenkins, 779 F.2d 606, 609 (11th Cir. 1986)).  This is not to say that the government is held to a lesser showing—"each element of a conspiracy must also be proven as to each defendant beyond a reasonable doubt; the law simply recognizes that all co-conspirators need not play identical roles in perpetuating the unlawful agreement."  United States v. Toler, 144 F.3d 1423,

29

1428 (11th Cir. 1998) (explaining that a defendant can be convicted if his involvement in the conspiracy is "slight" in comparison to the actions of the other co-conspirators).

This "minimal threshold" showing may be made through direct or circumstantial evidence, and a common purpose or plan may be inferred from a variety of circumstances. Calderon, 127 F.3d at 1326. One such circumstance is "repeated presence at the scene of the drug trafficking." Id.; see also Tinoco, 304 F.3d at 1122-23 ("[A] defendant's presence, although not determinative, is a material factor when weighing evidence of conspiracy. A defendant's presence becomes more significant when the value of the contraband is high.") (internal quotation marks and citation omitted).

Here, a reasonable jury could find that the evidence established Carrasquilla's guilt on the conspiracy charge beyond a reasonable doubt. See Tinoco, 304 F.3d at 1122. Medrano testified that Carrasquilla was physically present while three loads of cocaine, totaling approximately 486 kilograms, were loaded on board the *Borocho*. See id. at 1122-23 (noting that a defendant's presence is a "material factor" that "becomes more significant" when the conspiracy involved high-value contraband).

Importantly, Fontalvo testified that Carrasquilla was paid for his complicity and silence and, indeed, the evidence demonstrates that Carrasquilla was arrested

30

with more than $2,100 in U.S. currency on his person, which is consistent with Barona-Bravo's $2,000 payment to Medrano (in $100 U.S. bills) for the last 200-kg load. It is also far more than the average mariner would make working aboard the *Borocho*; Medrano testified that his salary was 700,000 Colombian pesos, or approximately $350 per month. In addition, there was evidence that Fontalvo attempted to or was going to send additional money to people tapped by Carrasquilla: his wife, Edythe Ballestas Carrasquilla, and Miguel Ballestas.

Contrary to Carrasquilla's suggestion, his case is not "materially indistinguishable" from our prior decision in Garate-Vergara, where this Court affirmed the acquittal of several crew members who were arrested on a drug-carrying vessel. 942 F.2d at 1549. In that case, the evidence established that cocaine was stored in a freshly painted compartment beneath legitimate cargo and, upon the ship's apprehension, several crew members began throwing bags of cocaine overboard. Id. at 1546-47. This Court upheld the district court's order of acquittal for those crew members arrested without paint on their hands and against whom the government had offered no evidence that they were aware of the secret compartment or its illicit contents. Id. at 1549. This Court also reversed one crew member's conviction where the only evidence tying him to the conspiracy was a used plane ticket that showed previous travel with three other defendants six weeks before the voyage. Id. Here, the government offered much more, including

31

Carrasquilla's presence while several large loads of cocaine were being loaded onto the *Borocho*, his acceptance of payment, and the presence of significant cash on his person.

Examining all of the proven circumstances in this case, including but not limited to Carrasquilla's presence during the loading of the narcotics, a reasonable jury could find beyond a reasonable doubt that Carrasquilla had knowingly and voluntarily participated in the conspiracy. See Tinoco, 304 F.3d at 1122; Calderon, 127 F.3d at 1326-27. While we recognize Carrasquilla's argument that the evidence could support an inference that he merely played along to maintain his safety, the evidence supports the opposite inference too—that he was aware of the smuggling conspiracy and willingly accepted payment in exchange for his silence. "A jury is free to choose among the constructions of the evidence," and we will not overturn the jury's verdict as to Carrasquilla. Calderon, 127 F.3d at 1324 (quoting United States v. Hardy, 895 F.2d 1331, 1334 (11th Cir. 1990)); see also id. at 1326 (explaining that a defendant may be properly convicted on a conspiracy charge "even though his role is minor in the overall scheme").

## B.    Patino-Villalobos

Patino-Villalobos also only participated in the unsuccessful September voyage of the *Borocho*. Medrano testified that the 86-kg load (in three blue barrels) was delivered to the *Borocho* at night aboard a small speedboat. Barona-

Bravo, Patino-Villalobos, and two other men were on that speedboat. The crewmen on the *Borocho* threw down ropes, the men in the speedboat tied on the drugs, and the crew hauled it onboard.[12] The barrels were then placed in the ship's ballast tank.

Later, Medrano confided in Patino-Villalobos that he was worried the barrels were not well hidden in the ballast tank. Patino-Villalobos asked Barona-Bravo about moving the cocaine and putting it in sacks, but Barona-Bravo did not want to.

Medrano also testified that the entire crew, which would include Patino-Villalobos, met without the captain and agreed to take the second 200-kg load and share the profits. While housed with other crewmen in a Florida jail, Patino-Villalobos hatched and communicated a plan for the crewmen to claim that the cocaine was already on the ship and belonged to Calvo.[13] Additionally, Agent Galloza searched Patino-Villalobos's phone and SIM card and found that he had contact numbers for Julio Flores and Naranja.

---

[12]Patino-Villalobos points out that Medrano did not name him as one of the men who helped physically move the barrels from the speedboat to the *Borocho*.

[13]There is some ambiguity about how much money Patino-Villalobos had on his person when he was arrested. According to the Coast Guard's inventory sheet, which was filled out upon arrest, Patino-Villalobos only had 30,000 Colombian pesos in his possession. But when the FBI went to photograph and examine the items seized from the crewmen, there was now approximately 850,000 Colombian pesos and $2,000 in U.S. currency among the items purportedly belonging to Patino-Villalobos. The FBI agent in charge of this evidence admitted that the items did not match up and said he did not know how the additional money got into the evidence bag. Due to its confusing nature, we do not rely on this evidence in examining the sufficiency of the government's case against Patino-Villalobos.

33

Here, a reasonable jury could find that the evidence established Patino-Villalobos's guilt on the conspiracy charge beyond a reasonable doubt. Calderon, 127 F.3d at 1326; Tinoco, 304 F.3d at 1122-23. According to Medrano's testimony, Patino-Villalobos was aware of at least the 86-kg and the second 200-kg loads. While Patino-Villalobos argues that he was not physically present at the loading of the second 200-kg delivery, he does not dispute that he was aware of this load and wished to partake in the proceeds.

As to possession with intent to distribute, the evidence established that Patino-Villalobos was on the speedboat that delivered the 86-kg load of cocaine. He also knew where the barrels of cocaine were hidden and expressed a desire to move or better conceal the cocaine. Given these facts, a reasonable jury could conclude that Patino-Villalobos, at the very least, "exercised some measure of dominion or control over the contraband." Tinoco, 304 F.3d at 1123. Thus, taking the evidence in the light most favorable to the government, Patino-Villalobos had actual or constructive possession of more than five kilograms of cocaine and a reasonable jury could find him guilty of the possession charge. See Tinoco, 304 F.3d at 1123 ("A defendant's intent to distribute . . . may be inferred from the large quantity of narcotics that were seized.").

## VI.  CARRASQUILLA'S MOTION FOR A NEW TRIAL

At the end of the trial, the district court, reading from the verdict form, announced that the jury had found Carrasquilla guilty of conspiracy, as charged in Count One, and had further found that the offense involved less than 500 grams. The district court polled the jury, and Juror No. 2, the foreperson, told the court, "There are two of them where you said 500 milligrams or less, and to the best of my knowledge, they all had five kilograms or more."  The district court returned Carrasquilla's verdict form to the jury and instructed the jurors to go back "and see if there's a mistake on what you already unanimously decided."

When the jury returned, Juror No. 2 confirmed that there had been a mistake in Carrasquilla's verdict form.  Juror No. 2 explained that the jury had found Carrasquilla guilty of Count One but that the offense involved five kilograms or more of cocaine.[14]  The district court reviewed the verdict form and observed that the jury had "crossed through the line that said, 'less than 500 grams,' and you have checked the line that says 'five kilograms or more.'"  The foreperson confirmed that that was correct.

The district court then asked Carrasquilla to stand and announced the corrected verdict: "[T]he verdict as to Count 1 of the indictment, the offense of conspiracy to possess with the intent to distribute cocaine while aboard a vessel

---

[14]The jury confirmed that the original verdict form against defendant Torres contained the same mistake.

35

subject to the jurisdiction of the United States, we the Jury find the Defendant,

Juan Carrasquilla-Lombada, guilty.  And the amount is five kilograms or more."

The district court again polled the jury, confirming that the corrected verdict was in

fact its verdict.

After the trial, Carrasquilla renewed his motion for a judgment of acquittal

and, in the alternative, moved for a new trial.  He argued that the confusion over

the jury's verdict rendered the corrected verdict unreliable and warranted a new

trial.  The district court denied the motion, concluding that sufficient evidence

supported Carrasquilla's conviction and, in light of how it handled the confusion

over the verdict, no new trial was needed.

Carrasquilla now argues that the district court abused its discretion in

denying his motion for a new trial because the jury's corrected verdict was

unreliable and inconsistent both with the evidence at trial and his acquittal as to

Count Two.  He argues that, given his acquittal on Count Two, "it is entirely

possible that the jury originally intended to acquit [him] on both counts, but

erroneously checked the guilty and '500 grams or less' box on the conspiracy

count."

Federal Rule of Criminal Procedure 31 authorizes a district court to

individually poll jurors after a verdict is returned.  Fed. R. Crim. P. 31(d).  "If the

poll reveals a lack of unanimity, the court may direct the jury to deliberate further

36

or may declare a mistrial." Id.; see also United States v. Warren, 594 F.2d 1046, 1050 (5th Cir. 1979) (stating that it is within a district court's discretion to direct further deliberations upon the discovery that a verdict may not be unanimous).[15]

Here, the district court immediately discontinued the poll upon learning of the possible mistake, directed the jury to continue deliberating, and then polled the jury after the corrected verdict was read to ensure it was, in fact, their verdict. On both occasions, the jury rendered a guilty verdict against Carrasquilla on Count One, and the only mistake was as to drug amount. There is no indication from the record that the jury twice failed to indicate its true verdict. The district court did not abuse its discretion in denying Carrasquilla's motion for a new trial. See Christiansen v. Wright Med. Tech., Inc., No. 16-12162, slip op. at 7, 26 (11th Cir. Mar. 20, 2017) (concluding, in context of a civil case, that the district court did not abuse its discretion in ordering the jury to continue deliberations upon its discovery that the verdict was inconsistent because "the district court acted in a neutral and non-biased manner in acknowledging and addressing the inconsistent verdict" and its action did not prejudice parties).

---

[15]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

## VII.  SENTENCING ISSUES

According to their individual presentence investigation reports ("PSRs"), all of the seven convicted codefendants had a total offense level of 38 and a criminal history category of I, resulting in an advisory guidelines range of 235 to 293 months' imprisonment.  Count One (the conspiracy charge) and Count Two (the possession charge) each carried statutory minimum sentences of ten years' and statutory maximum sentences of life imprisonment.  See 46 U.S.C. § 70506(a), (b) (providing that persons who violate the substantive MDLEA prohibitions on drug possession and distribution and persons who conspire to violate those prohibitions are both subject to the penalties set forth in 21 U.S.C. § 960); 21 U.S.C. § 960(b)(1)(B)(ii) (setting forth a ten-year minimum and lifetime maximum term of imprisonment for violations involving five kilograms or more of cocaine).

The district court sentenced Torres, Ortiz, Otero-Pomares, Patino-Villalobos, and Barona-Bravo to 235 months' imprisonment on Counts One and Two, to run concurrently, and it sentenced Carrasquilla and Tejada to 235 months' imprisonment on Count One alone.

Through mutual adoption of their co-appellants' briefs, the defendant-appellants have raised various challenges to their identical sentences on appeal. We first address whether the district court erred in attributing the entire 640.9

38

kilograms of cocaine found onboard the *Borocho* to each and every defendant as relevant conduct under U.S.S.G. § 1B1.3.

At sentencing, the parties agreed that the accurate total weight of cocaine found aboard the *Borocho* was 640.9 kilograms. And the district court attributed that full amount to all defendants, despite the fact that, on the penultimate day of trial, the district court had observed that the defendants had hidden certain drugs from each other:

> [T]his is a most unusual case . . . . [T]hese drugs were will hidden. It wasn't like they were in view for everyone to see. I mean, they took special precautions to hide the drugs, and they hid the drugs from each other. This wasn't a boat case where there was a – the boat itself was taking drugs for a particular person in Colombia and transporting it to Panama . . . . [T]hese were all side deals for individual people on the boat.

And at the sentencing hearing, the district court judge again observed that this was an "odd" conspiracy and that certain defendants "may not have known there were 640.9 kilograms of drugs on the vessel, but I do think it was foreseeable."

Further, at the July 7, 2015 sentencing, the district court did not have the benefit of the clarifying amendment to the relevant conduct sentencing guideline, U.S.S.G. § 1B1.3, which went into effect on November 1, 2015, and is to be given retroactive effect. See U.S.S.G. Suppl. to App. C, Amend. 790.[16]

---

[16]As a clarifying amendment, Amendment 790 is given retroactive effect and may be considered on appeal regardless of the sentencing date. See U.S.S.G. Suppl. to App. C, Amend. 790, Reason for Amendment (stating that the amendment made "clarifying revisions" to

Section 1B1.3 provides that a defendant's "relevant conduct" for sentencing purposes includes "all acts and omissions committed, aided, abetted . . . or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). In the case of a "jointly undertaken criminal activity," relevant conduct also includes certain acts and omissions of others. Id. § 1B1.3(a)(1)(B). The 2014 version of U.S.S.G. § 1B1.3(a)(1)(B), which the district court applied here,[17] specifically provided that "in the case of a jointly undertaken criminal activity" defendants are also accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (2014).

However, Amendment 790 struck that definition, and § 1B1.3(a)(1)(B) now defines "relevant conduct" in the case of jointly undertaken criminal activity to include:

> all acts and omissions of others that were—
> (i) within the scope of the jointly undertaken criminal activity,
> (ii) in furtherance of that criminal activity, and
> (iii) reasonably foreseeable in connection with that criminal activity;

---

§ 1B1.3); see also United States v. Jerchower, 631 F.3d 1181, 1184 (11th Cir. 2011) (explaining that subsequent amendments that clarify the guidelines—rather than serve as substantive amendments—are given retroactive effect and should be considered on appeal regardless of the sentencing date).

[17]The defendants were sentenced on July 7, 2015, so the district court applied the 2014 Sentencing Guidelines.

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B) (2015). In its commentary to Amendment 790, the Sentencing Commission explained that, where the prior version of § 1B1.3(a)(1)(B) focused on a seemingly two-part test in the text ("all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"), Amendment 790 "restructure[d] the guideline and its commentary to set out more clearly the three-step analysis the court applies in determining whether a defendant is accountable for the conduct of others in a jointly undertaken criminal activity under § 1B1.3(a)(1)(B)." U.S.S.G. Suppl. to App. C, Amend. 790, Reason for Amendment. While the "scope" element was previously articulated in the commentary to § 1B1.3, Amendment 790 now placed the "scope" element in the text of the guideline itself and provided several examples in the Application Notes of how the three-part test functions. Id.

Furthermore, the post-amendment guidelines commentary now directs that "[i]n order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the [district] court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." U.S.S.G. § 1B1.3, cmt. n.3(B) (2015) (emphasis added). Findings about the scope of the conspiracy as a whole are not sufficient under § 1B1.3(a) because, while a co-conspirator is often criminally liable for all of the acts done in furtherance of a

41

conspiracy, the limits of sentencing accountability are not coextensive with the scope of criminal liability. See id. (explaining that the scope of the jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant").

More clearly now for sentencing purposes, the scope of each defendant's jointly undertaken criminal activity depends on "the scope of the specific conduct and objectives embraced by the defendant's agreement." Id. (emphasis added). In making this determination, the district court may consider any explicit or implicit agreement fairly inferred from the conduct of the defendant and others. Id. Therefore, "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct" under this subsection. Id. (emphasis added). Further, a defendant's relevant conduct does not include conduct of members of a conspiracy prior to the defendant's joining of the conspiracy, even if the defendant knows of that conduct. Id.

Here, the record reflects that the district court confined its relevant-conduct analysis to the question of reasonable foreseeability and conflated the scope of the conspiracy for criminal liability purposes with the scope of the criminal activity agreed to or embraced by a particular defendant for sentencing accountability

purposes.  Without the benefit of Amendment 790, the district court did not make individualized findings on the record concerning the scope of criminal activity each particular defendant agreed to jointly undertake, as it is now required to do under § 1B1.3(a)(1)(B).  See id.  Instead, the district court made an implicit determination that the scope of the criminal activity that these particular defendants agreed to undertake was identical to the overarching conspiracy of smuggling 640.9 kilograms of cocaine from Colombia to Panama.  This determination necessarily means that, for some defendants, the scope of their individual agreements included deliveries of cocaine made before they even got on the ship.  And yet, the commentary to U.S.S.G. § 1B1.3, which is binding on us, directs that "relevant conduct" cannot include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct.  See U.S.S.G. § 1B1.3, cmt. n.3(B) (2015); Stinson v. United States, 508 U.S. 36, 37-38, 113 S. Ct. 1913, 1915 (1993) (holding that commentary to the sentencing guidelines is authoritative); see also United States v. Word, 129 F.3d 1209, 1213 (11th Cir. 1997) (holding that, where defendant did not join the conspiracy until "several months after its inception," such defendant's relevant conduct for sentencing purposes did not include losses caused by the conspiracy before he joined it).  The district court did not address this discrepancy on the record or make

43

any other factual findings from which we may undertake a review of its relevant-conduct determinations.

Further, the district court itself stated that certain defendants "may not have known there were 640.9 kilograms of drugs on the vessel" and that the defendants hid some of the drugs from each other.  These findings also militate against a determination that the scope of a defendant's agreement included drugs that the defendant knew nothing about or that were not reasonably foreseeable.

In short, given Amendment 790 and the particular factual circumstances of this case, the fact findings of the district court are insufficient for this Court to conduct meaningful appellate review of the defendants' sentences.  Therefore, we vacate the sentences of all seven defendant-appellants and remand for resentencing in accordance with Amendment 790 to U.S.S.G. § 1B1.3 and this opinion.[18]

---

[18]Our vacatur of the sentences here does not suggest or mean that there is any error in the defendants' convictions for the single overarching conspiracy charged in the indictment.  Here, the district court instructed the jury on a single-conspiracy theory.  The defendants never requested a multiple-conspiracy jury charge.  By rendering their verdicts, the jury implicitly found that only a single conspiracy existed for criminal liability purposes.  On appeal, to the extent the defendants argue the district court was required to find multiple conspiracies at sentencing, the defendants have shown no error in that regard.  See Calderon, 127 F.3d at 1329 (determining that the evidence demonstrated "a single overarching conspiracy to import and distribute cocaine from the Bahamas," even though some defendants participated in one load but not others, and observing that participation for the duration of only one or two loads "does not change the fact that what they joined was a single conspiracy with a common objective"); see also United States v. Brown, 587 F.3d 1082, 1089 (11th Cir. 2009) ("Separate transactions are not necessarily separate conspiracies, so long as the conspirators act in concert to further a common goal.  If a defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole, a single conspiracy is established.  It is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy.") (internal citations and quotation marks omitted).

We next briefly turn to the defendants' complaints regarding the district court's refusal to apply minor-role adjustments to their sentencing calculations or to give adequate consideration to the individualized sentencing factors described in 18 U.S.C. § 3553(a). Because we vacate the sentences of those defendants before us, we decline to consider those questions in the first instance. Once the trial court reassesses the relevant conduct determinations, it can then make individual determinations for each defendant regarding his respective role in the conspiracy and his respective personal circumstances, with attendant findings of fact. We note, however, that, as with its relevant conduct determinations, the district court did not have the benefit of recent amendments to the Sentencing Guidelines that "further clarify the factors to consider for a minor-role adjustment." Cruickshank, 837 F.3d at 1193. Nor did the court have the benefit of our discussion of those amendments in Cruickshank. See id. at 1193-95. Several of the factors discussed in those recent, but retroactive, amendments appear directly relevant to the circumstances of this unusual conspiracy.

To be clear though, nothing in this opinion reaches or decides the other sentencing issues about minor-role reductions and substantive reasonableness. After the district court makes the requisite findings about the relevant conduct of

---

Nevertheless, as explained above, the scope of criminal liability for a proper, single conspiracy conviction is not always coextensive with sentencing accountability for relevant conduct under amended guideline § 1B1.3. Given the odd nature of this single conspiracy, what is needed now are individual fact findings for sentencing accountability.

45

each defendant individually, the district court in the first instance should then make explicit fact findings on the defendants' minor role, if any, and any other sentencing arguments made by the government or the defendants.

## VIII.  CONCLUSION

For the foregoing reasons, we affirm all of the defendants' convictions but vacate all of the defendants' sentences and remand for resentencing.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**