[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14261
Non-Argument Calendar

_____

D.C. Docket No. 8:14-cr-00394-SCB-AEP-9

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VICTOR OTERO-POMARES,
RAFAEL ANTONIO PATINO-VILLALOBOS,
EDUARDO EMILIO ORTIZ-CERVANTES,
JACINTO TORRES,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 7, 2020)

Before GRANT, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial and a prior appeal, Defendants Eduardo Emilio Ortiz-Cervantes ("Ortiz"), Victor Otero-Pomares ("Otero-Pomares"), Rafael Antonio Patino-Villalobos ("Patino-Villalobos"), and Jacinto Torres ("Torres") (collectively, "Defendants") appeal their respective sentences, imposed based on their convictions for: (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a) and (b), and 21 U.S.C. § 960(b)(1)(B)(ii) ("Count One"); and (2) possession with intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(1)(B)(ii) ("Count Two").[1]

Upon review, we affirm the Defendants' sentences regarding their mitigating-role and drug-quantity challenges, but we remand to the district court on a limited basis with instructions to correct Torres's and Ortiz's judgments to conform to the oral pronouncement of their sentences.

---

[1]In our previous opinion, these surnames for the Defendants were used because we adopted each crew member's surname as used in their briefs. See United States v. Barona-Bravo, 685 F. App'x 761, 764-65, 765 n.2 (11th Cir. 2017) (unpublished). Currently, Otero-Pomares is the lead defendant, but over the course of this case and its appeals, the style of the case has changed as codefendants were acquitted or chose not to appeal.

2

## I. BACKGROUND

The Defendants were involved with other co-conspirators in a cocaine smuggling operation on board a dilapidated cargo vessel, the Borocho, that was on its way from Colombia to Panama to pick up cargo. United States v. Barona-Bravo, 685 F. App'x 761, 764 (11th Cir. 2017) (unpublished). The operation involved at least eight loads and 640.9 kilograms of cocaine. Id. at 764-67.

Thirteen of the Borocho's crewmen proceeded to trial and the jury convicted seven of them, including the four Defendants in this appeal. Id. at 764, 767. At sentencing, the district court determined that each of the seven crewmen were accountable for the entire 640.9 kilograms of cocaine found aboard the Borocho and denied them any mitigating-role reductions. Id. at 779. Ultimately, the district court sentenced each of the seven crewmen to 235 months' imprisonment, which was at the bottom of their 235-to-293-month advisory guidelines ranges. Id.

## II. FIRST APPEAL

In the first appeal, this Court affirmed the seven crew members' convictions but vacated their 235-month sentences and remanded for resentencing. Id. at 764. We concluded that the district court's factual findings regarding the drug amounts for which each crew member was accountable were insufficient for this Court to conduct meaningful appellate review of their sentences. Id. at 781-82. Because

3

we vacated the seven crew members' sentences, we declined to consider their other sentencing challenges.  Id. at 782.

At resentencing, the district court reassessed each crew members' relevant conduct, made individualized determinations and factual findings regarding their respective roles in the conspiracy and personal circumstances, and resentenced them.  The district court resentenced Ortiz and Otero-Pomares to total sentences of 235 months' imprisonment, Torres to 188 months, and Patino-Villalobos to 130 months.  Those four Defendants now appeal their new sentences.

### III. SECOND APPEAL

The four Defendants challenge, individually or collectively, their new sentences.  We review the trial evidence, the guidelines calculations, and the Defendants' sentencing hearings.

### A.    Trial Evidence

In the first appeal in this case, we provided a thorough picture of the facts underlying all seven crew members' convictions.  Barona-Bravo, 685 F. App'x at 764-67, 774-77.  We now summarize only the facts most pertinent in this second appeal, focusing primarily on each Defendant's relevant conduct.

The Borocho was a 208-foot cargo freighter that regularly traveled empty from Puerto Nuevo, Colombia, to Colón, Panama, to load legitimate merchandise on board at the free-trade zone in Colón, and then traveled back to Colombia.  Id.

4

at 764.  From April to September 2014, the Borocho made two voyages from Puerto Nuevo to Colón, during which various crewmen, unbeknownst to the captain, smuggled on board and hid eight loads of cocaine, totaling over 600 kilograms of cocaine.  Id. at 764-66.

In April 2014, Yensi Manuel Medrano-Blanquiceth ("Medrano") and Andres Ramon Fontalvo-Martinez ("Fontalvo") began working together with drug suppliers to smuggle cocaine onto the Borocho.  Id. at 764.  While the Borocho was still docked, they first coordinated the delivery of three loads of cocaine, including a 400-kg load ("400-kg load").  Id.  Aboard the Borocho at this time were Medrano, Fontalvo, and Defendants Ortiz and Torres, among others.  Id. Each of these crewmen knew about, and helped participate in, this first smuggling scheme.  Id.  For example, Ortiz and Torres helped throw ropes down from the Borocho to the deliverers of the cocaine and hauled the cocaine loads on board. Medrano and another crewman hid these loads in the Borocho's forepeak.

In June 2014, the Borocho set sail on its first voyage from Puerto Nuevo, Colombia to Colón, Panama.  Id.  Once in Panama, the entire crew—including Ortiz and Torres—unloaded the three cocaine loads and delivered them to their intended recipients on land.  During the crew's stay in Panama, Fontalvo and Medrano met with drug suppliers to discuss another drug smuggling operation aboard the Borocho.  Id.  On the Borocho's return to Colombia, a small boat

5

approached and delivered a 100-kg load of cocaine ("100-kg load"), which was then hidden in the Borocho's forepeak. Id.

Once the Borocho was docked in Colombia, the crew unloaded the legitimate merchandise but left the 100-kg cocaine load hidden on board. Id. At this point, there were changes to the Borocho's crew: some crewmen left, some remained, and some new crewmen were hired. Id. Among the new crewmen were Defendants Otero-Pomares and Patino-Villalobos. Id. at 764-65.

Subsequently, Fontalvo coordinated a 200-kg delivery of cocaine and notified Medrano, Defendant Torres, and another crewman. Id. at 765. In the middle of the night, a small boat delivered the load, which consisted of approximately 214 kilograms of cocaine ("214-kg load"). Id. Medrano and Defendant Otero-Pomares hauled the 214-kg load on board the Borocho as Fontalvo, Defendant Torres, and another crewman watched. Id. Then, the crew—including Medrano and Defendants Ortiz, Otero-Pomares, and Torres—helped move the 214-kg load, as well as the prior 100-kg load, to a ballast tank underneath the cargo hold.[2] Id. Defendant Ortiz opened the ballast tank, Medrano and Defendant Otero-Pomares hid the loads inside of the tank, and Ortiz closed the

---

[2]The Borocho's ballast tanks were large spaces, built with walls containing large holes spaced every six to ten feet. Id. at 765 n.3.

6

hatch on the tanks.[3]

Thereafter, Defendant Patino-Villalobos and three other men approached the Borocho via a small speedboat and delivered three barrels containing 86 total kilograms of cocaine ("86-kg load").  Id.  Medrano, another crewman, and Defendants Ortiz, Otero-Pomares, and Torres threw down ropes and the men in the speedboat tied the drugs onto the ropes.  Id. at 765, 777.  The five Borocho crewmen hauled the drugs on board, moved them towards the cargo hold, and hid them in the ballast tank, in the same manner as the 214-kg and 100-kg loads.  Id.  Defendant Patino-Villalobos boarded the Borocho and later asked crewmen about moving the 86-kg load to better conceal it.  Id. at 777.

Once those three barrels were hidden on board, crewman Willington Barona-Bravo ("Barona-Bravo") gathered the entire crew—including each of the four Defendants—and told them about another 200-kg delivery.  Id. at 765, 777.  The crew agreed to take this load on board and share in the profits.  Id. at 777.  The delivery, containing approximately 195 kilograms of cocaine ("195-kg load"), came to the Borocho via speedboat later that night.[4]  Id. at 765.  Present for the

---

[3]After the 214-kg-load delivery, Medrano and Fontalvo participated in a separate delivery of a 13-kg cocaine load, which they also hid in the ballast tank.  Id. at 765.

[4]The trial evidence indicates that this cocaine load was approximately 200 kilograms. See id. at 765.  However, at the resentencing stage, both the probation officer and the district court referred to this load as a 195-kg load, and none of the parties objected to the discrepancy. To avoid confusion—and given that the Defendants have not objected to the lower figure—we refer to this load as the "195-kg load" throughout.

delivery were Medrano, Defendants Ortiz, Otero-Pomares, and Torres, and another crewman. Id. Medrano and Defendant Otero-Pomares threw down ropes, hauled the 195-kg load on board, moved the load to the cargo hold, and hid it in the ballast tank. Id. at 765-66. Defendant Ortiz again assisted by closing the hatch on the tank. Although not physically assisting, Defendant Patino-Villalobos was aware of the 195-kg load and wished to partake in the proceeds. Id. at 777.

Each Borocho crew member was paid only for the particular cocaine loads he knew about, regardless of whether he physically assisted with the load. Id. at 765. Problems would arise if a crew member found out about a cocaine load, but did not get paid, such that it was in each crew member's best interest to stay quiet about what loads each knew about. Each crew member was paid an advance for his particular loads while still aboard the Borocho, either directly in cash or through money deposited into his chosen third-party account. Id.

Importantly, Defendants Ortiz and Torres were paid for their involvement in the 400-kg load from the first voyage. Each crew member involved with the 214-kg and 100-kg loads received an advance payment of between two and ten million Colombian pesos for their assistance and silence. Defendants Otero-Pomares and Torres were paid approximately eight million Colombian pesos for those loads and both had their payments sent to their relatives. And, some who were involved with the 86-kg load received an advance payment of approximately four million

8

Colombian pesos—which was the equivalent of $2,000 in U.S. currency.

In September 2014, the Borocho left Puerto Nuevo for its second voyage to Colón, carrying more than 600 kilograms of cocaine hidden on board. Id. at 766. After setting sail, Barona-Bravo directed another crew member to pay Medrano for the 195-kg load: $2,000 in U.S. currency (in the form of 20 $100 bills) and 350,000 Colombian pesos (approximately $170). Id. All of the crewmen received the same payment for that load—Defendant Otero-Pomares had his payment sent directly to his mother and the remaining crew men received their cash payments on board. Id.

Two days after the Borocho launched, a U.S. Coast Guard cutter spotted the vessel in international waters 70 miles off the coast of Panama and conducted a right-of-visit boarding. Id. After determining that the Borocho was stateless, the Coast Guard boarding team searched the vessel, discovered drugs, detained the captain and 12 crewmen, and continued the search. Id.

The searches revealed 55 kilograms of cocaine hidden in a lube oil tank and three blue barrels and 23 burlap sacks filled with cocaine hidden in one of the vessel's ballast tanks located underneath the cargo hold. Id. Coast Guard personnel searched the first 20 feet from the ballast tank cover toward the back of the tank but deemed it unsafe to search any farther. Id. at 767 n.5. In total, the Coast Guard boarding team found 640.9 kilograms of cocaine on the Borocho. Id.

9

at 767.

When the Coast Guard searched the crewmen, nearly all of them had thousands of dollars' worth of U.S. and Colombian currency in their possession. Id. Specifically, Defendant Ortiz had over $2,300 in U.S. currency and 513,000 Colombian pesos on his person. Defendant Torres had $2,000 in U.S. currency and 2,900,000 Colombian pesos on his person. Because Defendant Otero-Pomares had his advances sent directly to his relatives, he had no currency on him upon arrest.

As to Defendant Patino-Villalobos, there was some ambiguity regarding how much he had on his person upon arrest. Id. at 777 n.13. A Coast Guard inventory sheet filled out upon arrest showed that Patino-Villalobos had only 30,000 Colombian pesos in his possession. Id. However, when the Federal Bureau of Investigations ("FBI") photographed and examined the items seized from the crewmen, there was now approximately 850,000 Colombian pesos and $2,000 in U.S. currency among the items purportedly belonging to Patino-Villalobos. Id. The FBI agent in charge of this evidence conceded that the money figures did not match up and testified that he did not know how the additional money got into the evidence bag.[5] Id.

_____

[5]In determining in the first appeal whether there was sufficient evidence supporting Defendant Patino-Villalobos's convictions on the conspiracy and possession counts, we declined to rely on the ambiguous trial evidence regarding how much money Patino-Villalobos had on his

10

The captain and 12 crewmen were transported to Tampa, Florida, where they were processed into the United States.  Id. at 767.  While housed in jail with other crewmen, Defendant Patino-Villalobos devised and communicated a plan for the crewmen to blame the 195-kg cocaine load on another co-conspirator and claim that the load was already on the Borocho when they boarded.  Id. at 777.

## B.    Resentencing Hearings, Guidelines Calculations, and Sentences Imposed

Upon remand, six of the crew members were resentenced.[6]  Because only the four Defendants have appealed, we discuss solely their resentencing.

The Defendants' amended presentence investigation reports ("PSRs") included the drug amounts that each was individually responsible for and the role that each played in the offense.  Namely, the PSRs recommended that the Defendants be held accountable for the following conduct:

- Ortiz and Torres knew about and participated in smuggling the 400-kg load during the first voyage in June 2014, and they either were directly involved in loading and hiding, or had knowledge of and were paid to keep quiet about, the four loads from the second voyage—the 100-kg, 214-kg, 86-kg, and 195-kg loads—making them responsible for approximately 995 kilograms of cocaine.

- Otero-Pomares either was directly involved in loading and hiding, or had knowledge of and was paid to keep quiet about, the four loads from the

---

person upon arrest.  Id. at 777 & n.13.  However, as discussed later, at resentencing, the government put on additional evidence showing that Patino-Villalobos upon arrest was found in possession of $2,000 in U.S. currency and over 800,000 Colombian pesos.

[6]One of the crewmen, Juan Carrasquilla-Lombada, died in September 2018 before resentencing.  The district court dismissed the indictment against him.

second voyage—the 100-kg, 214-kg, 86-kg, and 195-kg loads—making him responsible for approximately 595 kilograms of cocaine.

- Patino-Villalobos either was directly involved in loading and hiding, or had knowledge of and was paid to keep quiet about, two of the loads from the second voyage—the 86-kg and 195-kg loads—making him responsible for approximately 281 kilograms of cocaine.

Consequently, the PSRs assigned base offense levels of: (1) 38 for Ortiz (995 kilograms), Otero-Pomares (595 kilograms), and Torres (995 kilograms) because they were involved with 450 kilograms or more of cocaine pursuant to U.S.S.G. § 2D1.1(c)(1); and (2) 36 for Patino-Villalobos (281 kilograms) because he was involved with 150 to 450 kilograms of cocaine pursuant to § 2D1.1(c)(2).[7] The PSR did not assign the four Defendants any mitigating-role reduction.

Ortiz's, Otero-Pomares's, and Torres's total offense levels of 38 and criminal history categories of I yielded, again, advisory guidelines ranges of 235 to 293 months' imprisonment.  Patino-Villalobos's total offense level of 36 and criminal history category of I yielded an advisory guidelines range of 188 to 235 months' imprisonment.  Both Counts One and Two carried a statutory mandatory

---

[7]In determining the Defendants' offense levels, the probation officer used the 2014 Sentencing Guidelines Manual—which was the manual in effect at the time of their original resentencing in 2015—incorporating all guideline amendments.  See 18 U.S.C. § 3742(g)(1) (providing that, upon a remand to the district court for resentencing, the district court shall apply the Sentencing Guidelines that were in effect on the date of the defendants' pre-appeal sentencing, along with any guideline amendments in effect on such date); U.S.S.G. § 1B1.11(a), (b)(2) (providing that the district court generally should use the Guidelines Manual that is in effect on the date of sentencing, but, if applying an earlier edition, the district court should consider subsequent clarifying amendments).

minimum sentence of ten years and a statutory maximum penalty of life imprisonment.  See 46 U.S.C. § 70506(a), (b); 21 U.S.C. § 960(b)(1)(B)(ii).

The Defendants lodged numerous objections to the PSR, either in writing or at their respective sentencing hearings.  Defendants Ortiz, Otero-Pomares, and Patino-Villalobos objected: (1) to not receiving any mitigating-role reduction pursuant to U.S.S.G. § 3B1.2(b); and (2) to the drug amounts for which they were held accountable.[8]

The Defendants were resentenced separately.  At Defendant Torres's resentencing, the district court found that he was accountable for 995 kilograms of cocaine and that he was not entitled to a minor-role reduction.[9]  The district court granted Torres a two-level reduction under the "safety valve" provision of § 2D1.1(b)(17), reducing his total offense level from 38 to 36.  The district court concluded Torres's revised advisory guidelines range was 188 to 235 months' imprisonment and sentenced him to 188 months' imprisonment on each count, to run concurrently.  As a condition of his supervised release, the district court ordered Torres to "submit to random drug testing, not to exceed 104 tests per year if requested."

---

[8]Otero-Pomares and Torres raised additional objections which are not at issue in this appeal.

[9]On appeal, Torres does not challenge this drug quantity or the lack of a minor-role reduction.

At Defendant Otero-Pomares's resentencing, the district court found that he was accountable for 595 kilograms of cocaine and overruled his mitigating-role objection. The district court explained that Otero-Pomares's role was not substantially less than that of the average participant because he had knowledge of all the drugs he was held responsible for, he was directly involved in physically bringing the drugs on board and/or moving the drugs to another location, and he was paid for his participation. The district court implicitly adopted the PSR's guidelines calculations and advisory guidelines range of 235 to 293 months' imprisonment, and resentenced Otero-Pomares to 235 months' imprisonment on each count, to run concurrently. Otero-Pomares was not ordered to submit to random drug tests.

At Defendant Ortiz's resentencing hearing, the district court found him accountable for 995 kilograms of cocaine. As to the 195-kg load, the district court found that Ortiz physically assisted in hiding this load by opening and closing the ballast tank so that other crewmen could hide the load inside the tank, and was paid for his involvement. The district court overruled Ortiz's minor-role objection for the same reasons it denied Otero-Pomares's objection. The district court adopted the PSR's guidelines calculations and advisory guidelines range of 235 to 293 months' imprisonment, and resentenced Ortiz to 235 months' imprisonment on each count, to run concurrently. As a condition of his supervised release, the

14

district court also ordered Ortiz to "submit to 104 . . . urine tests a year for drug testing, no more than that."

At Defendant Patino-Villalobos's resentencing, he raised both his drug-quantity and minor-role objections. He primarily argued that there was insufficient evidence that he knew of or was involved in the 195-kg load. Patino-Villalobos, however, agreed with the district court that he would be better off, and that his sentence would be lower, if the court held him accountable for both the 86-kg and 195-kg loads but granted him a minor-role reduction, rather than if the court held him accountable solely for the 86-kg load but denied him a minor-role reduction.

The government called Drug Enforcement Administration Special Agent Carlos Galloza, who had interviewed Medrano as part of the investigation. Special Agent Galloza testified that Medrano identified Patino-Villalobos as a participant in both the 86-kg and 195-kg loads. As to the 195-kg load, Medrano told Special Agent Galloza that Patino-Villalobos was present for Barona-Bravo's meeting about smuggling that load onto the Borocho, that no one at the meeting objected to the plan, that Patino-Villalobos was present for the hauling of the load onto the Borocho, that the crew members were supposed to receive $2,000 in U.S. currency for their involvement with the load, that Barona-Bravo provided the payments to another crew member to pay those involved in the load, and that Medrano heard that each involved crew member was paid, although he did not know the exact

15

payment amounts.

Additionally, Special Agent Galloza testified that—according to the FBI's report on the personal property in each crew member's evidence bag—the Coast Guard recovered $2,000 in U.S. currency and 880,000 in Colombian pesos from Patino-Villalobos's personal effects. Special Agent Galloza clarified that the $2,000 in U.S. currency reflected Patino-Villalobos's full payment for the 195-kg load, and that the 880,000 in Colombian pesos reflected his partial payment for the 86-kg load.

On cross- and recross-examination, Special Agent Galloza conceded: (1) that Fontalvo never implicated Patino-Villalobos in any of the cocaine loads; (2) that there were discrepancies between Medrano's trial testimony and Special Agent Galloza's interview notes; (3) that the crewmen were paid equivalent amounts for the 86-kg and 195-kg loads, but that the 86-kg load was paid in Colombian pesos and the 195-kg load in U.S. currency; and (4) that the Coast Guard's inventory sheet reflecting the money found in Patino-Villalobos's possession upon arrest did not show the $2,000 in U.S. currency.[10] As to the discrepancies, Agent Galloza's interview notes said that Medrano identified

[10]Defense counsel for Patino-Villalobos very briefly questioned Special Agent Galloza on recross-examination about the Coast Guard's inventory sheet that did not list the $2,000 in U.S. currency. Defense counsel's primary questioning and argument, however, assumed that $2,000 in U.S. currency was found in Patino-Villalobos belongings, but that the $2,000 was just as likely to be payment for the 86-kg load as it was for the 195-kg load.

Defendant Patino-Villalobos as a participant in the 195-kg load, but, at trial, Medrano made no specific mention of Patino-Villalobos's presence for the hauling or moving of the 195-kg load.

After hearing arguments, the district court found that Patino-Villalobos's relevant conduct included both the 86-kg and 195-kg loads. As to the 195-kg load, the district court explained that, while there was some conflict, there was enough evidence that Patino-Villalobos was paid $2,000 in U.S. currency for his participation in the 195-kg load and that $2,000 in U.S. currency was found in his possession upon arrest.

Next, while the district court found Patino-Villalobos accountable for both the 86-kg and 195-kg loads, it found that his participation in the conspiracy was "very limited." For example, the district court explained that, while there was testimony that Patino-Villalobos received payment for the 195-kg load, there was no evidence that he helped haul or move the cocaine. Thus, the district court sustained his minor-role objection, applied the two-level reduction to his base offense level, and applied an extra three-level reduction under U.S.S.G. § 2D1.1(a)(5) (2014) (providing that, if "the defendant receives an adjustment under § 3B1.2 (Mitigating Role)," his base offense level of 34 is decreased by 3 levels).

The district court lowered Patino-Villalobos's base offense level to 31,

17

which yielded an advisory guidelines range of 120 to 135 months' imprisonment.[11]

The district court sentenced Patino-Villalobos to 130 months' imprisonment on

each count, to run concurrently. As a condition of his supervised release, the

district court ordered that he "submit to random drug testing, not to exceed 104

tests per year."

The Defendants' written judgments correctly reflected their imprisonment

terms, but Ortiz's, Patino-Villalobos's, and Torres's judgments did not limit the

number of drug tests per year. Instead, they stated, "You must refrain from any

unlawful use of a controlled substance. You must submit to one drug test within

15 days of release from imprisonment and at least two periodic drug tests

thereafter, as determined by the court."

The four Defendants appeal their sentences.[12]

_____

[11]Ordinarily, with a total offense level of 31 and a criminal history category of I, Patino-Villalobos's advisory guidelines range would be 108 to 135 months' imprisonment. See U.S.S.G. § 5A. However, because he was subject to statutory mandatory minimum sentences of ten years' (120 months') imprisonment, those statutory mandatory minimum sentences became part of his guideline range. See U.S.S.G. § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.").

[12]We note that Torres's appeal was untimely by 18 days. See Fed. R. App. P. 4(b)(1)(A)(i) (providing that, to be timely, an appellant in a criminal case must file a notice of appeal in the district court within 14 days after the judgment or challenged order is entered on the docket). Nevertheless, because the government does not object to the timeliness of Torres's appeal, we reach the merits. See United States v. Lopez, 562 F.3d 1309, 1311-13 (11th Cir. 2009) (explaining that the timeliness of a notice of appeal under Rule 4(b) for criminal defendants is a claims-processing rule, not a jurisdictional bar, such that the government can forfeit an objection to an untimely notice of appeal).

18

## IV. MITIGATING-ROLE REDUCTION

Defendants Ortiz and Otero-Pomares argue that the district court clearly erred in declining to apply mitigating-role reductions.

### A.    Standard of Review

"We review a district court's denial of a role reduction for clear error." United States v. Valois, 915 F.3d 717, 730 n.8 (11th Cir.), cert. denied, 140 S. Ct. 263 (2019).  This Court will not disturb a district court's mitigating-role findings "unless we are left with a definite and firm conviction that a mistake has been made."  Id. at 731.  "The court's choice between two permissible views of the evidence will rarely constitute clear error, so long as the basis of the trial court's decision is supported by the record and the court did not misapply a rule of law." Id.  Ortiz and Otero-Pomares bear the burden of establishing, by a preponderance of the evidence, their mitigating roles in the offense.  See id.

### B.    Section 3B1.2 and Amendment 794 to the Commentary

Under § 3B1.2 of the Sentencing Guidelines, a defendant is entitled to a mitigating-role reduction by (a) four levels if he was a "minimal participant in any criminal activity," or (b) two levels if he was a "minor participant in any criminal activity."  U.S.S.G. § 3B1.2(a), (b) (2014).[13]  A defendant is a "minimal

---

[13]On appeal neither Ortiz nor Otero-Pomares contest that they were culpable for the cocaine loads for which they were held accountable.

participant" if he was "plainly among the least culpable of those involved in the conduct of a group." Id. § 3B1.2, cmt. n.4 (explaining that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant"). A defendant is a "minor participant" if he was "less culpable than most other participants" in the criminal activity, but his role "could not be described as minimal." Id. § 3B1.2, cmt. n.5. In determining whether a defendant is entitled to a mitigating-role reduction under § 3B1.2(a) or (b), or an intermediate adjustment, the district court must consider the totality of the circumstances and the facts of the particular case. Id. § 3B1.2, cmt. n.3(C).

In United States v. De Varon, this Court established two principles to "guide the determination of whether a defendant played a minor role in the criminal scheme: (1) 'the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing,' and (2) '[his] role as compared to that of other participants in [his] relevant conduct.'" United States v. Presendieu, 880 F.3d 1228, 1249 (11th Cir. 2018) (quoting United States v. De Varon, 175 F.3d 930, 940 (11th Cir. 1999) (en banc)). "In making the ultimate finding as to role in the offense, the district court should look to each of these principles and measure the discernable facts against them." De Varon, 175 F.3d at 945. In the drug courier context, district courts should consider the "amount of drugs, fair market value of

20

drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution." Id. (stressing that this is a non-exhaustive list and that no single factor is more important than another). This is a highly fact-intensive determination that "falls within the sound discretion of the trial court." Id.

Similarly, Amendment 794 (the amended commentary to § 3B1.2) offers a non-exhaustive list of relevant factors to be considered in this "fact-intensive, multi-faceted approach." Presendieu, 880 F.3d at 1249; see also United States v. Cruickshank, 837 F.3d 1182, 1193 (11th Cir. 2016) (providing that Amendment 794 to the commentary to § 3B1.2 was meant to "further clarify the factors for a court to consider for a minor-role adjustment" in a way that "still continue[s] to embrace the approach we took in De Varon"). These relevant factors include: (1) "the degree to which the defendant understood the scope and structure of the criminal activity"; (2) "the degree to which the defendant participated in planning or organizing the criminal activity"; (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (4) "the nature and extent of the defendant's participation in the commission of the criminal activity"; and (5) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. Supp. to App. C, Amend. 794; U.S.S.G. § 3B1.2, cmt. n.3(C) (2015).

21

"The court must consider all of [the § 3B1.2] factors to the extent applicable, and it commits legal error in making a [mitigating] role decision based solely on one factor." Valois, 915 F.3d at 732 (quotation marks omitted); see, e.g., Cruickshank, 837 F.3d at 1194-95 (concluding that, "although nothing in De Varon or Amendment 794 [to § 3B1.2's commentary] precludes a district court from considering the drug quantity with which the defendant was involved as an indicator of his role, we think it was legal error for the district court to say that this is the only factor to be considered in a case like this one").

## C.    Ortiz's and Otero-Pomares's Arguments as to the Minor-Role Reduction

Defendant Ortiz contends that he was entitled to a four-level minimal-role reduction because his role essentially was to stay quiet, not turn in his co-conspirators, and assist in moving the cocaine around. Alternatively, he argues that, at the very least, he was entitled to a two-level minor-role reduction. Otero-Pomares argues that he was entitled to a two-level minor-role reduction because he was a low-level physical laborer who moved or hid the drugs and was already held accountable for the drug quantity in each cocaine load that he physically handled.

The district court did not clearly err by finding that Defendants Ortiz and Otero-Pomares were not entitled to minor-role reductions, let alone any minimal-role reduction. The inquiry under De Varon's first principle is whether the defendant "played a relatively minor role in the conduct for which [he] has already

22

been held accountable—not a minor role in any larger criminal conspiracy." De Varon, 175 F.3d at 944; United States v. Martin, 803 F.3d 581, 591 (11th Cir. 2015).  Ortiz and Otero-Pomares do not contest that the record shows that they knowingly participated in the illegal transportation of a large quantity of cocaine—five cocaine loads totaling 995 kilograms for Ortiz and four cocaine loads totaling 595 kilograms for Otero-Pomares.  See Barona-Bravo, 685 F. App'x at 764-66, 777.

Further, their specific roles in transporting the cocaine loads encompassed important duties.  Namely, Otero-Pomares knew and stayed quiet about each of his four cocaine loads and helped haul them on board, move them to the cargo hold, and/or hide them in the ballast tank.[14]  Id. at 765-66, 777.  While Ortiz had varying levels of participation in each of the five cocaine loads he knew and stayed quiet about, his participation encompassed being present for deliveries, throwing down ropes, hauling the loads on board, moving the loads towards the cargo hold, opening and closing the ballast tank while others hid the loads inside, and, in one case, unloading and delivering a load to the intended recipient.  Id. at 764-65, 777.

Although Ortiz and Otero-Pomares characterize their roles as merely providing manual labor and staying quiet about the cocaine loads, their roles were

---

[14]While Otero-Pomares did not haul the 100-kg load on board, he later helped move and hide that load.  See id. at 765.

23

much more important to the overall drug trafficking scheme. Through their efforts, they helped secure: (1) the onloading of large amounts of cocaine to be transported between Colombia and Panama; (2) the concealment of the cocaine to avoid detection by the Borocho's captain as well as by outside parties; and (3) the secrecy of the individualized agreements for each load to prevent discord amongst crew members and/or the sharing of profits between the crew members who found out about the load. Therefore, these Defendants' roles ensured the conspiracy's continuation and success.

Moreover, both Ortiz and Otero-Pomares were held accountable only for the cocaine loads in which they participated. While these circumstances do not render them ineligible for the minor-role reduction, they preponderate against any mitigating role. See U.S.S.G. § 3B1.2, cmt. n.3(C); De Varon, 175 F.3d at 941-43; see also United States v. Monzo, 852 F.3d 1343, 1347 (11th Cir. 2017) (considering, as part of the totality of the circumstances, that the defendant participated in drug distribution, "was responsible only for his direct role in the conspiracy, and that he was important to the scheme").

Ortiz and Otero-Pomares emphasize that, under § 3B1.2 commentary's list of factors, they did not plan or organize the conspiracy, had no decision-making authority, and had no ownership interest in the cocaine. See U.S.S.G. § 3B1.2, cmt. n.3(C). Even so, the record shows that, under the third factor in § 3B1.2's

24

commentary, Ortiz and Otero-Pomares were present at Barona-Bravo's meeting about the 195-kg load and agreed to take the load on board and share in the profits, showing at least some level of influence over Barona-Bravo's exercise of decision-making authority. See id.; Barona-Bravo, 685 F. App'x at 765, 777. Additionally, the fact that their roles were important to the drug trafficking scheme was relevant to the fourth factor in § 3B1.2's commentary about the nature of the defendants' participation in the criminal activity. See U.S.S.G. § 3B1.2, cmt. n.3(C). And, that Ortiz and Otero-Pomares received advance payments for the cocaine loads they participated in showed that they stood to benefit financially from the completion of the drug trafficking conspiracy, which is the fifth factor. See id.; Barona-Bravo, 685 F. App'x at 765.

In addition, under De Varon's second principle, the record indicates that neither Ortiz nor Otero-Pomares were "less culpable than most other participants in the criminal activity," let alone "plainly among the least culpable of those involved in the conduct." See U.S.S.G. § 3B1.2, cmt. n.4, n.5. The record shows that several of the crewmen on board the Borocho were similarly tasked—with being present for the delivery of the loads; physically hauling, moving, and/or hiding the loads; and staying quiet about their involvement—including Medrano and Torres, neither of whom received a minor-role reduction. Barona-Bravo, 685 F. App'x at 764-66, 777.

25

To the extent that Ortiz and/or Otero-Pomares had any lesser physical role in their various cocaine loads in comparison to the other crew members, that fact alone would not make them minor or minimal participants. "The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." De Varon, 175 F.3d at 944. Rather, each of the manual laborers appeared to be average participants and Ortiz and Otero-Pomares presented no evidence at trial or at sentencing to show that they were less culpable.

In sum, Ortiz and Otero-Pomares did not carry their burden to show how they were "plainly among the least culpable" or less culpable than "most other participants" in the criminal activity. See U.S.S.G. § 3B1.2, cmt. n.5; Valois, 915 F.3d at 731. Based on the totality of the circumstances and the record in this case, the district court did not clearly err in denying Ortiz and Otero-Pomares minor-or-minimal-role reductions under § 3B1.2(a) or (b).

## V. DRUG QUANTITY AS TO 195-KG COCAINE LOAD

Defendants Ortiz and Patino-Villalobos argue that the district court clearly erred in including the 195-kg cocaine load in its calculation because the government did not prove by a preponderance of the evidence that this load was

26

reasonably foreseeable to them.[15]  Their arguments fail because the district court found they were paid for and were involved in that 195-kg load and held them accountable for their own conduct.

## A.    Standard of Review

Generally, a defendant's advisory guidelines range is determined based on all "relevant conduct."  United States v. Valarezo-Orobio, 635 F.3d 1261, 1264 (11th Cir. 2011) (quotation marks omitted); see U.S.S.G. § 1B1.3(a) & cmt. n.2 (2014).  "We review only for clear error the application of the relevant conduct guideline in § 1B1.3 to the facts of the case."  United States v. Valladares, 544 F.3d 1257, 1267 (11th Cir. 2008).

## B.    Relevant Conduct under § 1B1.3

Relevant conduct includes the defendant's own acts in perpetration of the offense and, "in the case of a jointly undertaken criminal activity," "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1) (2014).  More specifically, in controlled-substance cases, a defendant is accountable under subsection (a)(1)(A)

---

[15]While Patino-Villalobos explicitly raises this issue, Ortiz purports to adopt by reference any non-adverse issues raised in his co-appellants' initial briefs, which ostensibly includes this issue.  This issue is arguably too fact-intensive and individualized to be generally adopted. United States v. Cooper, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000).  Namely, while both Ortiz and Patino-Villalobos were held responsible for the 195-kg load, their involvement in that load differed and Ortiz's involvement was proven at trial, whereas Patino-Villalobos's involvement was proven more at sentencing.  Although Ortiz's general adoption is probably inadequate, we need not resolve that issue because his claim so readily fails in any event.

27

for all drug quantities with which he was directly involved, and, under subsection (a)(1)(B) for all drug quantities involved in transactions carried out by other co-conspirators so long as "those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity." Id. § 1B1.3, cmt. n.3(D) (2015).

C.     Ortiz's Drug-Quantity Arguments

As to Defendant Ortiz, the district court found that he was directly involved in the 195-kg load because he physically assisted in hiding the load by opening and closing the ballast tank while other crewmen hid the load inside the tank, and Ortiz was paid for his involvement. The district court did not clearly err in making this finding under § 1B1.3(a)(1)(A) because, as previously discussed, the evidence supports Ortiz's direct involvement in this load. See infra Section IV.

D.     Patino-Villalobos's Drug-Quantity Arguments

As to Defendant Patino-Villalobos, the district court found that, while there was no evidence that he helped haul or move the 195-kg load on board, the evidence showed that he received a payment of $2,000 in U.S. currency for his involvement in the 195-kg load and that $2,000 in U.S. currency was found in his possession upon arrest. Taken together, the trial and sentencing evidence also showed that: (1) all crew members other than the captain, which includes Patino-

28

Villalobos, were present at Barona-Bravo's meeting about the 195-kg load; (2) each attendee at the meeting agreed to receive the load and share in the proceeds; (3) Patino-Villalobos was present when the 195-kg load was hauled on board; and (4) while housed in jail awaiting trial, Patino-Villalobos came up with a plan to falsely blame another co-conspirator for the 195-kg load and claim that it was hauled onto the Borocho before he came aboard, and communicated that plan to other crewmen. See Barona-Bravo, 685 F. App'x at 765-66, 777.

Patino-Villalobos's quarrels with the strength of the sentencing evidence are unconvincing. Although Medrano did not mention Patino-Villalobos when testifying at trial about who was present for the delivery of the 195-kg load, Medrano did not state that Patino-Villalobos was not present, and the district court was entitled to credit Special Agent Galloza's sentencing testimony that in his interview Medrano did mention Patino-Villalobos's name. See id. at 765.

And, while Special Agent Galloza conceded some discrepancies in the evidence regarding Patino-Villalobos's payment for the 195-kg load, the district court was entitled to choose between two permissible views of the evidence and find that the $2,000 in U.S. currency found by the FBI among Patino-Villalobos's personal property belonged to him and was payment for the 195-kg load, rather

than the 86-kg load.  See Valois, 915 F.3d at 731.[16]  Importantly, despite the Coast Guard's inventory sheet's omission of the $2,000 in U.S. currency, the trial and sentencing evidence, taken together, showed that: (1) Barona-Bravo directed another crew member to pay those involved in the 195-kg load $2,000 in U.S. currency plus 350,000 Colombian pesos; (2) the crewmen received the payment for the 195-kg load; (3) the FBI found among Patino-Villalobos's personal property $2,000 in U.S. currency and over 800,000 Colombian pesos; and (4) the 86-kg load was paid completely in Colombian pesos, not U.S. currency.  See Barona-Bravo, 685 F. App'x at 766, 777 n.13.

In sum, the district court did not clearly err in finding that the trial and sentencing evidence, taken together, was sufficient to show, by a preponderance of the evidence, that Patino-Villalobos was directly involved in the 195-kg load under § 1B1.3(a)(1)(A).  See U.S.S.G. § 1B1.3, cmt. n.3(D); Valois, 915 F.3d at 731.

## E.    Invited Error

Alternatively, and as an independent basis for affirmance, we conclude that

---

[16]In raising his arguments, Patino-Villalobos contends that each cocaine smuggling transaction involved here was a separate criminal activity rather than one jointly undertaken activity.  To the extent that Patino-Villalobos intends to argue that each cocaine load was a separate conspiracy, this Court already rejected such a notion in the first appeal and concluded that this was a single overarching conspiracy.  See Barona-Bravo, 685 F. App'x at 782 n.18 ("By rendering their verdicts, the jury implicitly found that only a single conspiracy existed for criminal liability purposes.  On appeal, to the extent the defendants argue the district court was required to find multiple conspiracies at sentencing, the defendants have shown no error in that regard.").

Defendant Patino-Villalobos invited any error that he now wishes to cure.  When a defendant either affirmatively seeks or expressly consents to a particular decision by the district court, the doctrine of invited error precludes him from complaining on appeal that any resulting error from the decision is reversible.  See United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009).

At resentencing, the district court clearly indicated that it would either: (1) hold Patino-Villalobos accountable for solely the 86-kg load and deny a minor-role reduction; or (2) hold him accountable for both the 86-kg and 195-kg loads and grant a minor-role reduction, noting that the latter situation would result in a lower advisory guidelines range.  Patino-Villalobos explicitly agreed that he would be better off, and would receive a lower sentence, in the latter scenario, thereby providing his explicit consent to such an approach.  As a result, the district court found him responsible for both the 86-kg and 195-kg loads and granted him a two-level minor-role reduction.  Accordingly, Patino-Villalobos has invited any error he now claims.  See id.

## VI. CONFLICT BETWEEN ORAL PRONOUNCEMENT AND WRITTEN JUDGMENT

Defendants Ortiz and Torres argue that their amended written judgments improperly vary from the district court's oral pronouncements of their sentences by failing to limit the number of random drug tests to which they must submit.  They request that we reverse their sentences and remand to the district court with

31

directions to enter amended judgments conforming to its oral pronouncements that they were required to submit to a maximum of 104 drug tests per year. The government agrees.

"When a sentence pronounced orally and unambiguously conflicts with the written order of judgment, the oral pronouncement governs." United States v. Bates, 213 F.3d 1336, 1340 (11th Cir. 2000) (remanding to the district court with instructions to correct the written judgment (which stated the defendant's term of supervised release as three years) to accord with the oral pronouncement of sentence (which announced the term as five years)).

At their respective resentencing hearings, the district court unambiguously stated that Ortiz and Torres were required to submit to random drug testing but that the tests would not exceed 104 per year. However, their amended written judgments provide that they "must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court," without any mention of the 104-drug-tests-per-year restriction. Given this clear conflict, we remand to the district court on a limited basis with instructions to correct Ortiz's and Torres's judgments to conform to the oral pronouncement of its sentences. See Fed. R. Crim. P. 36 ("After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record

32

arising from oversight or omission"); <u>Bates</u>, 213 F.3d at 1340.[17]

**AFFIRMED IN PART, VACATED IN PART AND REMANDED WITH INSTRUCTIONS.**

---

[17]Patino-Villalobos has not raised this drug-testing issue or sought to adopt his codefendants' challenges to their drug testing. The district court did not impose the drug-testing condition on Otero-Pomares, let alone the restriction on the number of drug tests per year. Thus, their sentences are affirmed in this regard.